UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

WILMA TISCH,

Plaintiff,

v. 16 CV 2991 (LGS)

KENNETH HENDEL, et al.,

Defendants.

------------------------------x

New York, N.Y.
May 17, 2016
10:54 a.m.

Before:

HON. LORNA G. SCHOFIELD,

District Judge

APPEARANCES

BOIES, SCHILLER & FLEXNER LLP
Attorneys for Plaintiff
BY: LUKE W. NIKAS
NISHANTH V. CHARI

CAHILL PARTNERS LLP
Attorneys for Defendants Hendel, Gallery Art
BY: JOHN R. CAHILL
-and-
STOK FOLK KON
BY: ROBERT A. STOK (By Telephone)
JOSEPH M. KAYE (By Telephone)

HILL RIVKINS LLP
Attorneys for Defendant Day & Meyer
BY: MARC I. KUNKIN

(In the robing room)

THE DEPUTY CLERK: Good morning, counsel. We are here in the matter 16 Civil 2991, Tisch v. Hendel, et al.

Counsel for plaintiff, please state your name for the record.

MR. NIKAS: Luke Nikas, Boies, Schiller & Flexner, on behalf of plaintiff Wilma Tisch.

THE COURT: Who's with you?

MR. NIKAS: My associate.

MR. CHARI: Nish Chari.

THE COURT: Thank you.

MR. STOK: Good morning, your Honor. My name is Robert Stok, the law firm of Stok Folk & Kon in Miami, Florida. We're appearing pro hac vice and I'm here with my associate Joseph Kaye. And we represent defendants Kenneth Hendel, Gallery Art Group, Inc., and Gallart.com, Inc.

THE COURT: Hello.

MR. CAHILL: John Cahill from Cahill Partners on behalf of the same defendants as local counsel.

MR. KUNKIN: Mark Kunkin of Hill Rivkins on behalf of Day & Meyer, Murray & Young Corp.

THE COURT: Good morning, everyone. So there have been a fair number of submissions here. Let me review what I have and what I've read.

What I have is I have an initial letter from

Mr. Cahill on behalf of what he calls and what I would call the Florida defendants and that's dated May 5.

I also have a letter dated May 10 from Mr. Cahill and Mr. Nikas, which is the joint letter for the initial conference, which this is, and with a proposed case management plan and scheduling order.

I also have a letter dated May 12 from Mr. Nikas which purports to oppose the removal but, of course, the case has been removed, but I suppose that means in support of remand.

MR. NIKAS: That's correct, your Honor.

THE COURT: And then I have a letter dated May 16 from Mr. Kunkin which states the position of the defendant Day Meyer with respect to the claims against it.

Also a letter dated May 16 from Mr. Nikas which addresses or responds to that letter.

And then I have something that was filed what looks like just yesterday but I did not get it until this morning which simply attaches a case and it is from Mr. Stok on behalf of the Florida defendants. And the case basically stands for the proposition that under certain circumstances, someone in the position of the Gallery Art Group would not have -- actually, I'm not sure if it's Gallery Art Group or Day in this case, but would not have liability.

So there are really two purposes for the conference today and perhaps three. One is I wanted to talk a little bit

about the question of subject matter jurisdiction. The case, of course, has been removed; and the plaintiff I think would like to file a remand motion or has filed a remand motion?

MR. NIKAS: Your Honor, we do intend to file one, but we didn't want to do so without your Honor's guidance. I've obviously read your individual practices and see that you require premotion letters with respect to that issue. So we had assumed on our side that the May 5 submission from the defendants and my May 12 letter was essentially the premotion letters that your Honor requires.

THE COURT: Yes.

MR. NIKAS: And should you require further briefing, we will certainly submit a notice of motion and a motion requesting remand.

THE COURT: So let me ask the plaintiffs why Day and Doe are substantial parties. I know that you say you have a conversion claim against them, but there seems to be some real question about the viability of such a claim and whether you could even make a prima facie showing. Why don't you address that.

MR. NIKAS: Yes, your Honor, I'd like to start very briefly -- you've read the letters so I won't go into too much detail, but I do want to focus your Honor on the standard that applies in these circumstances and that is there's no possible viable claim against Day & Meyer or John Doe, and the

plaintiffs do not bear the burden to show that there's jurisdiction. Of course, the converse is true.

With respect to those claims, Day & Meyer received notice from Tisch and also by a forwarded email from counsel to Michael Haber, who is the art dealer who held the work, was intending to sell the work in New York, that Tisch asserted a claim of ownership over the painting. Day & Meyer the week before the claim was filed represented that it did have the work and it would not release the work absent a resolution of this dispute. Unlike in the case, for example, that you received last night where the notice to the party holding the work was that there was joint ownership of the property. There's no notice the work in that situation, as ours, was stolen. There's no notice in that case, as in ours, that Ms. Tisch asserted a paramount right to ownership.

THE COURT: It was basically a letter. What was provided to Day at the time I thought was simply a letter.

MR. NIKAS: There was one letter and there's a subsequent phone call on the Friday.

THE COURT: So anybody can sent a letter or make a phone call.

MR. NIKAS: Certainly. But the substance of the letter was an assertion of Tisch's paramount right of ownership over the property that Day & Meyer held. And subsequent to that letter, I believe it was the next day, the Friday before

the case was filed, was a statement that Day & Meyer held property owned by Wilma Tisch. It should not release the property to Hendel. Tisch had a paramount -- in the words of the case submitted last night from the defendant -- had a paramount right of possession and ownership. Day & Meyer confirmed it would not release the work and then that next week did release the work to the defendants in Florida.

THE COURT: So just imagine though that you're in a situation where you have a contractual relationship with a bailee and they're holding property of yours and you say, okay, it's time to send it back and someone, not a party to the relationship, writes a letter and says, wait, I have an interest in this property, you know, don't comply with your contractual relationship. How does that person have any standing to interfere with the contractual relationship and the holder's obligation to return the property?

MR. NIKAS: Because the plaintiff's, in this situation, the plaintiff's rights to possession of the work and ownership of the work supersedes Hendel's claim to possessing it and owning it.

THE COURT: But they hadn't established -- there was no court order. There was nothing given to Day to establish, except a phone call and a statement, that they had a superior right of ownership. So how is the holder of the property to deal with that?

MR. NIKAS: The holder of the property is to deal with it in one of two ways. The first way is either to return the property to Mrs. Tisch, and I can understand in the circumstances why they would not and I can understand that, your Honor.

THE COURT: Okay.

MR. NIKAS: But that would relieve them, in our view, of any liability.

THE COURT: To you, for sure, but they would have lots of liability to their counterparty.

MR. NIKAS: So, your Honor, I respect that as a practical matter.

So let me put it this way. To the extent Tisch proves that she does own the painting in this case, they would not have liability to the counterparty, so it creates a risk. So the way that most storage facilities deal with that risk is exactly how Day & Meyer said it was going to deal with that risk on the phone call prior to the lawsuit and that is they have a policy and they put it that way because they do, as we understand it, in most --

THE COURT: There was a communication at some point, wasn't there, where they said, correction, you need to give us a court order or something else or we're going to release the property.

MR. NIKAS: Let me clarify the timing of that.

THE COURT: All right.

MR. NIKAS: And you'll see why the circumstances end up the way they did.

THE COURT: Okay.

MR. NIKAS: On Friday before the lawsuit was filed, and I could look at a calendar but it was the second week of April, the end of that week, Tisch was informed, we were informed they would not release the property per their policy. And that's how most fine arts storage facilities deal with situations like this -- the parties resolve it. We're going to be independent of this. We're not going to ship it to someone over a claim of paramount right of ownership and possession. You resolve this and come back to us. That's what we were told on Friday.

On Tuesday morning I received a phone call from Day & Meyer's counsel saying we're going to release the work right now, not tomorrow, not the next day. And I asked for the opportunity to walk into New York State court and get a temporary restraining order. And I was told you don't have one now, we're releasing it immediately. They released it immediately without giving us the opportunity to do that, turned it over to John Doe. John Doe ships the painting or causes the painting to be shipped to Hendel in the Gallery Art in Florida.

Had we been given the opportunity, which we asked for,

to file the TRO, we would have immediately done so. We had no interest in making this a public dispute. We wanted to discuss the situation with them. I had had prior calls with who was going to be Hendel's counsel in New York from Hughes Hubbard. I actually have a good relationship with him. We were going to talk about settlement. We had set up a phone call to talk about settlement on Wednesday of that week, but instead what happened was the painting was ripped out from underneath us on the same day we were told it was going to happen.

THE COURT: In the end though, switching now to a separate subject, what does it matter? The painting is being held pending a resolution of this dispute. It's not so different than if you had talked to your colleague at Hughes Hubbard and there had been some resolution, presumably there will either be a settlement here or an adjudicated resolution. I suspect there will be a settlement. But, in any event, what, except for the jurisdictional issue, what does it matter whether Day or Doe are in the suit?

MR. NIKAS: Your Honor, the circumstances that transpired after that are very important to my client as a practical matter. The work was shipped. My client understood the work was in safekeeping at Day & Meyer, wouldn't be released. We incurred substantial costs fighting the shipment of the work to Florida. We had to make this dispute public.

Subsequently, there were a number of different

articles in which statements were made about my client, I would say defamatory statements attributing quotes to me that were never made about my client, which were highly inflammatory and offensive to me personally and to my client. The painting was shipped to Florida. Mr. Hendel released pictures of himself --

THE COURT: My apologies for interrupting, but I just don't want to lose the thought. What does all that have to do with anything?

MR. NIKAS: I'm getting to that. Aside from the impact that all of that had on my client's views of the defendants, the trustworthiness and honesty, but I don't want to go into that in too much detail. But, nonetheless, those are considerations that we do care about, she does care about.

The painting was then in Mr. Hendel's gallery. He released photos of the painting in his gallery. There's a temporary restraining order that prevented him from moving the painting. It was moved out of the gallery into his home. We have very serious concerns about the willingness of the defendants to comply with the temporary restraining order. We have very serious concerns about what may be done with the painting. We have serious concerns that the painting was in a facility that was safe and secure and neutral and now it's not. Then it was subsequently moved after a court instructed that it not be moved.

The events that happened after the painting was

released over my objection and assertion of paramount right of ownership were troubling to me and my client to say the least.

THE COURT: So what would your damages be against Day & Meyer?

MR. NIKAS: The damages would be --

THE COURT: Assuming the painting is safe and ultimately delivered to its rightful owner, whoever that may be.

MR. NIKAS: We have the conversion claim. As of right now we don't know what the damages would be because we don't know whether the painting is safe. Assuming all that is true, participating in a conversion of the painting at a minimum entitles us to success on the claim and at a minimum entitles us to nominal damages against Day & Meyer. Subject to further discovery, I can't answer your Honor's question. Of course, I'd have to see what happened to the painting, what were the impacts -- we could amend the claim, for example, for defamation as a result of the articles.

We're at a place right now where we believe the facts present a viable claim against Day & Meyer. The case they sent last night actually in my view reinforces that fact because there was notice to Day & Meyer that's very different from the notice that was provided in that case. So ultimately the question will be what's happened to the work since, what were the impact of the statements.

THE COURT: I'm going to interrupt you just there because I think I understand your position and I'm running a little behind, so let me hear from the defendants.

MR. CAHILL: Mr. Stok, do you want to start?

MR. STOK: Yes, absolutely. First of all, Day & Meyer indicated in their first communication that they were not going to allow release of the painting unless title could be established. Accordingly, we sent them a copy of the Sotheby's catalog indicating the provenance of the painting. We showed them also the consignment agreement between the party that my client purchased the painting from at Sotheby's. We showed them a copy of our invoice from purchase. We showed them proof of payment for the painting. And based upon our capacity to show Day & Meyer the fact that we had ownership of the painting, they released the painting.

The articles that Mr. Nikas discusses were a direct result of their application for a TRO and nothing else. The publicity was caused by seeking the drastic relief that they sought against parties over which New York courts have no jurisdiction.

THE COURT: Mr. Stok, could I interrupt you for a second.

MR. STOK: Absolutely. I apologize. I know it's difficult over the phone.

THE COURT: It is difficult over the phone. I guess

everything you say makes sense to me, but the one hurdle is the extremely high standard that is imposed on the defendant in order to succeed on a claim of basically fraudulent joinder. And so what about this issue of no possible claim against Day & Meyer?

MR. STOK: There is no possible claim against Day & Meyer and that's established by the case law and I provided the *Ardisco Fin. Corp. v. de Margoulies* case for the Court reported at 21 A.D.2d 295, 1964 case. And it essentially says as between the bailor and the bailee, the bailee could not, without being guilty of a conversion, refuse to redeliver a painting to the bailee.

THE COURT: Can I interrupt you just a second.

MR. STOK: Absolutely, yes.

THE COURT: What I'd like to do is just sort of wrap this up and tell you where I think I am. I have fairly detailed argument from you all and I would be prepared to consider what you have submitted without further written submissions unless somebody feels that they really need to put in something that they weren't able to.

And the one person I haven't heard from is Mr. Kunkin or at least the one represented party. So is there anything you'd like to add and also particularly address my question of whether you think I can just rule based on what I've been submitted.

MR. KUNKIN: I would like to just comment to some of the things that have been said here today.

My firm was appointed as counsel for Day & Meyer and Day & Meyer received notice of the supposed issue in this case from Michael Haber, not from the Tisch family. There were no direct communications that were permissible from the Tisch family. The only person that ever called or spoke to Day & Meyer directly was counsel for the plaintiff after he knew we represented Day & Meyer. In fact, he had notice that we were going to release it unless he obtained a court order because Tisch, even though they knew it was stolen, never reported it on the Stolen Art Registry, never had a police report. We had nothing but somebody with a Tisch name behind a voice on a phone telling us that it was stolen.

We had a customer who owned the artwork, stored it with us on the agreement that we would give it back to him unobstructed who had paperwork. Counsel was supposedly going to court the day before we released it. I had spoke to counsel and he told me he was standing in federal court himself. And I said can you put me on the phone with the judge. He says, well, I'm not actually before a judge yet. I said, well, you need to get that court order because when the instructions come in, we cannot hold the artwork.

I found out from my client on the way here that on the day they released it, counsel called my client directly and

said they wanted my client to hold the artwork until 9:30 because he was getting a TRO. My client couldn't reach me that morning -- there was a lot of phone tag -- released the artwork after 9:30. The injunction was obtained the following day from a different court, New York Supreme Court. That complaint clearly shows no claim against us. It doesn't even pretend.

The case gets removed here. Suddenly my client becomes a valuable player and an amended complaint wants to be filed. However, counsel hasn't treated us like a party to this case. Your Honor's rules require a joint letter for the initial conference and a proposed case management plan. I was never consulted. I was never provided with any orders in this case. I have been ignored and given the status --

THE COURT: You're happy to be a party.

MR. KUNKIN: I don't see why suddenly now because they want to fight over jurisdiction, now all of a sudden we should actually treat me like a party to the case. It hasn't happened yet.

THE COURT: Let me interrupt and make a proposal. It sounds like there's the potential for some bad feelings here because of some serious miscommunication, but it also sounds like something that ought to be resolved so that the painting can just make its way to wherever it's supposed to be. And so what I am inclined to do, but tell me your reaction to this, is I think I should refer you for settlement discussions to Judge

Francis, if you are all happy doing that. I will take the issue of remand under advisement. I will wait to hear from you on what Judge Francis rules before making my ruling on remand so that in the event I decide there's no subject matter jurisdiction, you find yourself with the rug pulled out from you when you may be fairly far into serious settlement negotiations.

In the meantime, however, I will enter a scheduling order assuming I'm going to have jurisdiction, but I am not prejudging that at all. In fact, my inclination at the moment is to think that I do not have jurisdiction, but I've not decided it. I haven't reviewed the case law. And, admittedly, there's a very high standard, as plaintiff points out, that the defense needs to meet.

So that is my proposal, but I need your agreement that you want to talk to Judge Francis because otherwise it's a waste of time.

MR. NIKAS: You have my agreement, your Honor.

MR. STOK: Your Honor, this is Robert Stok. We would like the opportunity to brief the issue. I believe the three-page letter that we sent to the Court, we weren't really able to develop all the issues relating to the absence of any real parties in interest other than Gallery Art and Wilma Tisch and I believe that a full briefing is instructive and would be called for under these circumstances.

MR. CAHILL: Your Honor, if I may, Mr. Stok, I agree with you if the issue has to be decided, we should brief it because we think both the facts and the circumstances of the law suggest it's a nominal party with nominal damages. But, Mr. Stok, we haven't had a chance to discuss this, but as both a plaintiff and a defendant, I've been involved with Magistrate Judge Francis in various things and he's an excellent vehicle for resolving issues. So at the risk of giving advice over the telephone with everyone listening, it would be a good idea, I think, if we could get in front of Judge Francis. He acts pretty quickly.

MR. STOK: I agree. I would like to have the opportunity to mediate the dispute. I think a good settlement is always better than a lawsuit and even a bad settlement is better than a good lawsuit. So we welcome that opportunity.

THE COURT: Okay. So what I'm going to do --

MR. KUNKIN: Your Honor, if I may.

THE COURT: Yes.

MR. KUNKIN: I was wondering if by chance the party with the artwork and the party that wants the artwork would be willing to go before Judge Francis without my client.

THE COURT: I'll let you all work that out. Is that acceptable?

MR. NIKAS: I'll have to consider it, your Honor.

THE COURT: That is really none of my affair.

MR. KUNKIN: You're asking for our consent to it.

THE COURT: What I'm going to do though is refer it for settlement to Judge Francis and Judge Francis I'm sure will require that all the parties be there. So what you can do is talk among yourselves and if you can reach an agreement and explain the circumstances to Judge Francis, I'm sure he won't require that be you there since you don't have the art and you don't want the art.

MR. KUNKIN: Correct.

THE COURT: So, and it of course wouldn't be relevant to, because it's in the context of settlement discussions, I wouldn't consider whether you were at the table or not.

MR. KUNKIN: I'm aware and I wasn't using that for any other purpose.

THE COURT: I'm just saying I'm also aware.

MR. KUNKIN: Okay.

THE COURT: So I will do a referral order and I will ask for the remand motion to be filed in four weeks. That will give you a little bit of time. If you're close, but not quite there, then ask for an extension. But, otherwise, I will expect to see the opening papers.

And then I would like the response can I say ten days later? You all know already -- and I'll put all the dates in an order on ECF so that you know what they are. And then we'll do a reply five days later.

MR. KUNKIN: Your Honor, can we have more time for the reply? I'm actually on vacation.

THE COURT: Let's do a week?

MR. KUNKIN: Can I have three weeks for the response?

THE COURT: Ten days for the response and then I was going to say a week for the reply.

MR. KUNKIN: My problem is the response. I'm actually on vacation with the family and then I have doctor's appointments for my child at the Children's Hospital in Philadelphia.

THE COURT: So how long?

MR. KUNKIN: It's the end of school. That's why I'm asking if we can have three weeks for the reply.

THE COURT: You mean the response.

MR. KUNKIN: Yes, the response. Sorry.

THE COURT: So three weeks for the response, one week for the reply.

And I'm hoping that you will get to Judge Francis and find a way to resolve this before you submit all these papers.

MR. NIKAS: Thank you, your Honor.

THE COURT: And in the meantime, I'll also enter a case management plan and I will expect you to adhere to it. So if it looks like things aren't settling, you need to get moving on discovery.

MR. STOK: Your Honor, as far as responding to the

complaint is concerned during this period over which we're deciding upon jurisdiction, what is the Court's --

MR. NIKAS: If I may, your Honor.

THE COURT: Mr. Nikas.

MR. NIKAS: I'll address this to you. We have already agreed as between the Florida defendants and Tisch to extend each other's time to respond to our New York complaint and to the Florida complaint to June 6, I believe it is.

MR. KUNKIN: There's a Florida complaint?

MR. NIKAS: The Florida defendants filed a complaint in Florida after our complaint in New York was filed. We've agreed to reciprocal extensions. We'll of course come back to each other recognizing that your Court is making a referral order to have a discussion on extensions.

THE COURT: What you can do is give me a stipulation to so order to relieve everybody of their obligations to file a response to the complaint.

MR. NIKAS: Thank you, your Honor. We'll of course do that.

MR. STOK: Thank you, your Honor.

o0o